UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIE B., | ) |
|     Plaintiff, | ) ) ) No. 20-cv-7440 |
| v. | ) ) Magistrate Judge Susan E. Cox |
| KILILO KIJAKAZI, Commissioner of the Social Security Administration, | ) ) ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Willie B.[1] ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits under the Social Security Act. The Parties have filed cross motions for summary judgment.[2] For the reasons detailed below, Plaintiff's Motion for Summary Judgment (dkt. 17) is GRANTED and Defendant's motion (dkt. 22) is DENIED. The case is remanded for further proceedings consistent with this opinion.

**1.     Social Security Regulations and Standard of Review**

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the

---

[1]     In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name(s).

[2]     The Court has construed "Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security" (dkt. 17) as a motion for summary judgment. Because the Commissioner thrice complains about the length of Plaintiff's brief (*see* dkt. 23, p. 1, 5, 11), the Court notes for the Commissioner that Plaintiff's brief complies with Judge Cox's Standing Order on Social Security cases, which allows 25 pages per brief.

evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535,539 (7th Cir. 2003); *see also*, 42 U.S.C. § 405(g).

2.  **Procedural Background and ALJ Decision**

On July 5, 2018, Plaintiff filed a claim for disability insurance benefits with an alleged onset date of December 1, 2016. (Administrative Record ("R.") R. 17.) Plaintiff subsequently amended his alleged onset date to February 19, 2018. (R. 18.) Plaintiff's claim was denied initially and upon reconsideration, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id*.) Subsequently, on March 17, 2020, the ALJ issued an unfavorable decision finding Plaintiff not disabled under the Act. (R. 18-33.) On October 20, 2020, the Appeals Council denied Plaintiff's request for review (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Plaintiff, through counsel, filed the instant action on December 16, 2020, seeking review of that decision. (Dkt. 1.)

The ALJ's decision followed the five-step analytical process required by 20 C.F.R. § 416.920. At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity from his amended alleged onset date of February 19, 2018 through his date last insured of December 31, 2018. (R. 21.)

At Step Two, the ALJ concluded Plaintiff had the severe impairments of depressive disorder; post-traumatic stress disorder ("PTSD"); and lumbar spinal impairment, status post transforaminal lumbar interbody fusion. (*Id*.) The ALJ determined Plaintiff's diabetes mellitus, hypertension, and obesity were nonsevere. (R. 21-22.) At Step Three, the ALJ concluded Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment. (R. 22-24.) The ALJ next found that Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following restrictions: pushing, pulling and operation of foot controls is limited by light lifting and carrying; he can occasionally balance, stoop, crouch, kneel, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds; he must avoid concentrated exposure to extreme cold, operational control of moving machinery, and unprotected heights; he is limited to work with simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements that involves only simple work-related decisions with few, if any, workplace changes; he is limited to work in a low-stress job, defined as end of the day type of work; he can occasionally interact with the public and coworkers, but can have no tandem tasks and only occasional supervision. (R. 24.) At Step Four, the ALJ concluded Plaintiff was unable to perform his past relevant work. (R. 31.) At Step Five, the ALJ found that other jobs in the national economy exist that Plaintiff can perform, considering his age, education, work experience, and RFC. (R. 32-33.) These findings led the ALJ to conclude Plaintiff is not disabled as defined by the Social Security Act. (R. 33.)

3. **Factual Background**[3]

On Halloween of 2012, Plaintiff was working as a CTA bus driver when he was brutally attacked by a group of 15 to 20 teenagers. (R. 380.) One of the teens shot him in the face with a paintball gun, and Plaintiff believed he had been shot with a real gun at the time. (R. 380, 574.) The teens then pushed him around the bus and beat him up (R. 380); he suffered injuries to his low back

---

[3] The Court has only recited the facts relevant to its decision here.

and left knee (R. 574). As a result of the injuries, he underwent transforaminal lumbar interbody fusion surgery at the L5-S1 level. (R. 596.) He also developed and was diagnosed with PTSD. (R. 567, 575, 577, 892-905.)

On November 17, 2014, Plaintiff was admitted for 8 days to the hospital with suicidal ideation, chronic depression, and chronic pain state. (R. 379, 383). Plaintiff informed physicians he had been depressed for two years, and despite his back surgery, he still experienced pain. (*Id*.) He reported increased depression due to severe back pain; poor sleep; excessive crying; flashbacks to his attack; and withdrawal from others. (R 380.) During this admission, Dr. Joseph Beck, M.D., diagnosed Plaintiff with major depressive disorder, recurrent, severe, without psychotic features. (R. 384.) Following the hospitalization, Plaintiff continued to see Dr. Beck for medication management (R. 565), and he also began seeing Dr. Daniel Kelley, Ph.D for counseling. (R. 555-58, 565-67, 890-905).

On December 6, 2017, Dr. Kelley provided an "Update Report of Psychological Treatment," summarizing a May 4, 2014 psychological examination indicating Plaintiff had significant depressive symptomatology and suicidal ideation. (R. 555-58.) Not only did Plaintiff have a significant medication regimen, but Dr. Kelley worked with Plaintiff on developing non-medication coping mechanisms: sleep management strategies, self-care behaviors, and psycho-education on stress reactions and somatic manifestations. (R. 555-56.) Plaintiff verbalized feelings of negative self-worth, hopelessness and helplessness regarding chronic pain, increased feelings of anger, decreased frustration tolerance, and difficulty handling minor daily life stressors. (R. 557.) He reported a pattern of social isolation and avoidant behaviors; he expressed that he felt stuck and could not do anything to move his life forward. (*Id*.) Dr. Kelley noted that, during behavioral sessions, Plaintiff "presented with a pattern of frequent tearfulness and anger outbursts in session, poor frustration tolerance, and limited adaptive coping skills." (R. 558.) Dr. Kelley diagnosed major depressive disorder and pain

4

disorder associated with both psychological factors and a generalized medical condition. (*Id*.) Dr. Kelley further opined that Plaintiff was a poor candidate for competitive employment. (*Id*.)

On July 21, 2018, Dr. Kelley provided an updated treatment report, covering the time period December 7, 2017 through July 20, 2018. (R 565-67.) He noted that, during this time period, Plaintiff "evidenced further emotional/psychological decompensation." (R 566.) Plaintiff informed Dr. Kelley he was paranoid, and a "nervous wreck" outside the house. (*Id*.) Plaintiff was tearful during most therapy sessions, and episodically missed appointments since he had difficulty getting out of bed two to three times per week. (*Id*.) Plaintiff reported increased isolative and avoidant behaviors, and, whenever he left the house, he experienced severe anxiety; he felt paranoid around people and could not defend himself. (*Id*.) He continued to report a pattern of social isolation and avoidant behaviors, despair, hopelessness, paranoia, and feelings that his medication was poisoning him. (*Id*.) Dr. Kelley began engaging in exposure therapy with Plaintiff. As part of exposure therapy, Dr. Kelley accompanied Plaintiff to retail stores, rode a public bus on a busy stretch of downtown Chicago, sat in a coffee shop, and walked down the street; he noted that Plaintiff "evidenced heightened autonomic arousal" in the form of sweats and tremors, and was unable to "maintain a normal conversation" with him while exposed to crowds of people. (R. 83, 566.) Given his presentation of hypervigilance, re-experience of symptoms and avoidant behaviors, Dr. Kelley diagnosed PTSD. (R. 567.) He again opined Plaintiff's prognosis was guarded-to-poor, and that he was not an appropriate candidate for competitive employment. (*Id*.) In Dr. Kelley's opinion, Plaintiff could not sustain regular attendance and would be unable to regulate his emotions and engage in a socially appropriate work manner; he would likely become socially withdrawn, or even physically aggressive if he felt threatened in the workplace. (*Id*.)

Dr. Kelley's treatment notes from August 2018 to September 2019 reflect symptoms of anxiety, hyperarousal, sleep disturbance, dysphoria, anger, isolation, agitation, suicidal ideation,

5

excessive ruminations, and paranoia. (R 893-906.) On October 10, 2019, Dr. Kelley provided a third update on Plaintiff's progress, covering the time period July 21, 2018 through September 21, 2019. (R. 890-92.) He stated that Plaintiff's treatment continued to be "significantly challenged by his limited coping skills and ongoing severe depressive symptoms." (R. 891.) Plaintiff endorsed suicidal ideation, increased isolative and avoidant behaviors, increased hypervigilance, fear of being in public and at home at night, hopelessness, helplessness, and feelings of despair and shame. (*Id*.) Dr. Kelley opined that: (1) Plaintiff's emotional and psychological functioning was progressively decreasing; (2) he would not be able to effectively work with others; (3) he would not be able to perform work-related tasks and implement appropriate decision making; (4) he could not maintain regular attendance due to isolative behaviors and episodic days where he reportedly did not leave his bedroom; and (5) given his increased agitation, anger, and poor frustration tolerance, he would be unable to regulate his emotions and engage with others in a socially appropriate workplace manner. (*Id*.) Dr. Kelley felt Plaintiff's prognosis was poor, and that he would be unable to sustain competitive employment. (R. 892.)

As part of his claim for disability insurance benefits, Plaintiff underwent two psychiatric consultative examinations. (R. 560-63, 574-77.) On February 5, 2018, Plaintiff met with Dr. Henry Fine, M.D. (R. 560.) Dr. Fine observed that Plaintiff was neatly groomed and dressed appropriately. (*Id*.) Plaintiff described general anxiety with worries, fears, and ruminations, poor concentration, easy distraction, and poor memory. (*Id*.) On the mental status evaluation, Dr. Fine noted Plaintiff's mood was depressed with little range, his affect was appropriate, and he displayed normal psychomotor activity; he demonstrated a deficit in immediate memory. (R 562.) Dr. Fine diagnosed mixed affective disorder secondary to general medical condition, with chronic pain syndrome. (R. 563.) On January 24, 2019, Plaintiff met with Dr. Kenneth Levitan, M.D., for a second psychiatric consultation. Dr. Levitan noted that Plaintiff anxiously and rhythmically shook his right leg as he sat, displayed poor

6

eye contact, and "was sad and anxious in his demeanor in a withdrawn and suspicious-like or paranoid way." (R. 574.) While recalling his attack on the bus, Plaintiff became upset; he rambled, stammered, and became angry and labile. (R. 575.) He expressed that he became depressed when around other people or outside; he explained that he had difficulties getting along with other people, was impatient and angry around them, and did not respect authority. (*Id*.) Dr. Levitan noted that Plaintiff was increasingly labile, and volatile while making these statements. (*Id*.) Dr. Levitan opined that Plaintiff could perform simple and routine tasks, communicate with coworkers and a supervisor, and follow, understand, and retain most instructions. (R. 577.) He also opined that Plaintiff would have difficulty handling mild to moderate work pressure and stress. (*Id*.)

**3.    Discussion**

Plaintiff alleges the ALJ erred in finding the opinions of Plaintiff's treating psychologist, Dan Dr. Kelley, PhD, unpersuasive, since that finding was based on serious mistakes of fact and errors in logic. (Dkt. 17, pp. 9-16 (referencing ALJ's opinion at R. 29).) The Court agrees and remands on this basis.

First, the Commissioner argues much of Dr. Kelley's opinions describe Plaintiff as unable to work or unable to meet competitive standards, which is true only as to Dr. Kelley's December 2017 report. (R. 555-58.) With respect to the July 2018 (R. 565-67) and October 2019 reports (R. 890-92), Dr. Kelley's opinions were more specific. For example, in July 2018, Dr. Kelley wrote Plaintiff was not an appropriate candidate for competitive employment because he could not sustain regular attendance and would be unable to regulate his emotions and engage in a socially appropriate work manner; he would likely become socially withdrawn, or even physically aggressive if he felt threatened in the workplace. (R. 567.) The October 2019 opinion goes into further detail, indicating Dr. Kelley felt Plaintiff could not work effectively with others; could not perform work-related tasks and implement appropriate decision-making; could not maintain regular attendance due to isolative

behaviors; and had an inability to regulate emotions given increased agitation, anger, and poor frustration tolerance. (R. 891-92.) The ALJ found Dr. Kelley's opinions "only somewhat persuasive." (R. 29.)

The ALJ acknowledged Dr. Kelley's reports that Plaintiff experienced sweats and tremors in a public retail store, but found that this "does not necessarily mean that [he] could not perform work with reduced social demands." (*Id.*) The Court finds this reasoning both speculative and illogical. It is speculative because the ALJ assumed, without evidence, that Plaintiff would react differently when surrounded by supervisors, coworkers, and the public in a work setting. (R. 24.) *See White ex. rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence"); *accord* SSR 86-8. The ALJ's reasoning was illogical because Plaintiff was unable to maintain normal conversation with Dr. Kelley when he was not working (R. 566), so even if being sweaty and tremulous would not necessarily preclude work involving reduced social demands, the record demonstrates Plaintiff could not concentrate when simply existing in a public setting. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (ALJ decision cannot be upheld if, "because of contradictions or missing premises [it] fails to build a logical bridge between the facts of the case and the outcome").

The ALJ also doubted Dr. Kelley's restrictions because Dr. Kenneth Levitan, M.D. (consultative psychiatrist), Dr. Liana Palacci, D.O. (conducted consultative physical exam) and Dr. Farooq Mohammed, M.D. (Plaintiff's primary care physician) "all indicated [Plaintiff] was cooperative and interacted appropriately." (R. 29). However, the ALJ did not explain why Plaintiff's cooperativeness bore on his ability to sustain appropriate workplace interactions, particularly since these physicians did not supervise or criticize Plaintiff's work. *See Felicia M. v. Saul*, 2020 WL 5763632, *7 (N.D. Ill. 2020) (reversing where ALJ failed to explain "how cooperative or polite

8

behavior, or even good familial relationships, translate into a greater ability to socially interact with others"); *Krystal C. v. Saul*, 2020 WL 6134983, *7 (N.D. Ill. 2020) (reversing where ALJ did not discuss how cooperative, pleasant behavior, or good mood and affect meant claimant could interact with public on occasional basis). Regardless, the Court finds the ALJ's reliance on Plaintiff's cooperativeness, instead of on his abnormal behavior during examination, illogical. *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (ALJ's decision cannot be upheld if it reflects "deep logical flaws" in the ALJ's reasoning process). Dr. Levitan noted that during a consultative examination, Plaintiff rambled, stammered, was angry and labile, displayed poor eye contact and questionable judgment, rhythmically shook his leg, and behaved in a "suspicious-like or paranoid way." (R. 574-75). In fact, Plaintiff became more angry, labile, and volatile as the interview progressed, and used profanity. (R. 576). Thus, the ALJ's conclusion that Plaintiff behaved "appropriately" during Dr. Levitan's "unremarkable" exam is contrary to the evidence; Plaintiff's behavior is more in line with Dr. Kelley's observations and opined restrictions for Plaintiff. *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (ALJ erred in failing to "explain the rationale for crediting the identified evidence over the contrary evidence"). While the ALJ correctly noted Plaintiff behaved cooperatively and appropriately with the other two physicians (R. 29), neither treated Plaintiff for his mental health;[4] there is no evidence Drs. Palacci and Mohammed were trained in assessing psychiatric conditions. Thus, the Court finds the ALJ's reliance on their observations, to the exclusion of the observations of Dr. Kelley (and Dr. Levitan), unreasonable. *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) ("… there is no reason to expect a doctor asked about an eye problem, or back pain, or an infection of the urinary tract to diagnose depression…he is not looking for it, and may not even be competent to diagnose it"); *see, also, Scott v. Berryhill*, 2018 WL 1069439, *4 (S.D.

---

[4] Dr. Palacci conducted a brief examination to determine Plaintiff's physical capabilities (R. 609-12), and Dr. Mohammed treated Plaintiff primarily for diabetes and hypertension. (R 629-50).

9

Ind. 2018) (ALJ reasonably rejected opinion of psychologist who opined on claimant's physical limitations).

The ALJ also found that Dr. Kelley's opinions were not supported by contemporaneous treatment notes. (R. 27-29.) However, while Dr. Kelley initially provided reports of psychiatric treatment in lieu of treatment notes, beginning in August 2018 he provided treatment notes. (*Compare* R. 555-58, 565-67 *with* R. 893-906). These treatment notes are not sparse; rather, they reflect symptoms of anxiety, hyperarousal, sleep disturbance, dysphoria, anger, agitation, suicidal ideation, excessive ruminations, and paranoia. (R. 893-906.) The ALJ was bothered that Dr. Kelley did not record Plaintiff's mental status in these notes, but overlooked the mental status examinations contained in his psychiatric reports. (R. 565-67, 890-92.) In the July 2018 report, for instance, Dr. Kelley observed that Plaintiff was tearful during most of the therapy sessions, and episodically missed appointments due to difficulties getting out of bed. (R. 566.) As part of exposure therapy, Dr. Kelley accompanied Plaintiff to retail stores, where he "evidenced heightened autonomic arousal" in the forms of sweats and tremors; he was unable to "maintain a normal conversation" with him while exposed to crowds of people. (R. 566.) The ALJ has not adequately explained why Dr. Kelley's mental status reports at a later date cannot substitute for contemporaneous notes, and the Court finds no such reason. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (reversing where the ALJ's decision "misstated some important evidence and misunderstood the import of other evidence"); *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (An ALJ must confront contrary evidence that does not support his conclusion and explain why it was rejected).

It was also Dr. Kelley's opinion that "regular attendance would not be realistic" for Plaintiff because Plaintiff episodically missed therapy appointments with him and because Plaintiff had "difficulty getting out of bed two or three days a week." (R. 566-67.) The ALJ faulted Dr. Kelley for both failing to define the frequency of "episodically" and that his opinion on Plaintiff's attendance

10

seemed to be based on Plaintiff's self-report. (R. 29.) The Court finds the fact Dr. Kelley noted *any* missed therapy appointments contradicts the ALJ's implication that Dr. Kelley's opinions on attendance were only based on Plaintiff's self-reports; Dr. Kelley has firsthand knowledge of Plaintiff's absences and has used that knowledge, in part, to opine on the frequency which he believed Plaintiff would be absent from a job. Moreover, psychiatric assessments are typically based on what an individual tells their mental health provider. *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) ("psychiatric assessments normally are based primarily on what the patient tells the psychiatrist"); *Adaire v. Colvin*, 794 F.3d 685, 688 (7th Cir. 2015) (same). The Court agrees with Plaintiff's argument that it is unclear how Plaintiff could establish – for the purposes of a Social Security disability claim – he had difficulty leaving his bedroom, without informing Dr. Kelley of the issue. (Dkt. 26, p. 3; R. 566.) Given other evidence Plaintiff isolated himself at home (R. 297, 557, 566, 891, 893-900), was afraid to leave the house (R. 902-05), and only went outside two to three days per week (R. 295), the ALJ unreasonably discounted Dr. Kelley's opinion on workplace attendance. *See Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021) (reversing where ALJ failed to cite evidence claimant could sustain work with minimal tardiness and no more than one absence per month, when record reflected persistent fatigue and depression).

Similarly, Dr. Kelley had no way of knowing Plaintiff felt hopeless and helpless, with diminished self-worth, without him reporting that symptom. (R. 566.) There is no evidence Dr. Kelley uncritically accepted Plaintiff's allegations; rather, Dr. Kelley observed Plaintiff was tearful during most of the therapy sessions, and, when engaged in exposure therapy at a public store, he trembled and was unable to engage in a normal conversation. (*Id.*) Likewise, an Agency field office employee observed that Plaintiff appeared to be agitated during his interview with Plaintiff, and that Plaintiff "kept a watchful eye on the people walking behind him," which is consistent with Dr. Kelley's statement that Plaintiff was hypervigilant. (R. 253, 892).

In sum, the Court does not agree with the Commissioner that Dr. Kelley's observations are "deeply buried" within his assessment and "greatly outnumbered by references to no more than Plaintiff's testimony" (Dkt. 23, pp. 5-6); rather the Court finds the ALJ improperly disregarded important, potentially determinative factors in deciding Dr. Kelley's opinions were unpersuasive. The Court must remand on this basis.

**4.     Conclusion**

For the foregoing reasons, the Court must reverse and remand for proceedings consistent with this Memorandum Opinion and Order. The Court declines to reach a decision on any other bases of error raised by the Plaintiff. Plaintiff's Motion for Summary Judgment (dkt. 17) is GRANTED and Defendant's motion (dkt. 22) is DENIED. The case is remanded for further proceedings consistent with this opinion.

Entered: June 1, 2022

_____
Susan E. Cox,
United States Magistrate Judge